IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

CHRISTINA TARGONSKI,                     )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )          No. 3:11-CV-269
                                         )
CITY OF OAK RIDGE,                       )
                                         )
                                         )
                    Defendant.           )

## MEMORANDUM OPINION

This civil rights action is before the court on defendant's motion for summary

judgment. [Doc. 15].  Plaintiff has responded in opposition [doc. 20], and the defense has

submitted a reply.  [Doc. 21].  The motion is now ripe for the court's consideration.

Defendant's motion will be denied as to plaintiff's hostile work environment claim but will

be granted in all other respects.

I.

*Pertinent Background*

Plaintiff worked for defendant City of Oak Ridge as a police officer from

August 2008 until September 1, 2010.  In November or December of 2009, plaintiff told her

supervisor, Sergeant Matthew Tedford, that she suspected Officer John Thomas was

spreading sexual rumors about her.  Plaintiff claims that Thomas also *directly* told her that

her "husband [was] trying to get him [Thomas] to have an orgy" involving Thomas's then-

girlfriend, Cassie Bridges, and that "he felt like I was a lesbian and I wanted to be part of it." [Plaintiff deposition, p. 202]. Plaintiff further testified, "After that, of course, that's when people started saying, we know what John is saying about you. That's when the rumors start[ed] coming to me."

Sergeant Tedford discussed the issue with his superiors. At plaintiff's request, Officer Thomas was transferred to another shift in February 2010. It is plaintiff's position that Thomas's sexual comments about her to others continued even though she and Thomas no longer directly worked with one another.

In January 2010, plaintiff also complained to Sergeant Tedford that she had received six unwanted calls on her cell phone "with heavy breathing and giggling," perhaps "having been made by a male disguising his voice in a manner to sound scary." The record does not indicate that the calls were sexual in nature. Sergeant Tedford opened a criminal investigation and subpoenaed plaintiff's cell phone records in order to identify the caller.

Plaintiff testified at her deposition, "I'm a Christian and I strive really hard to be a moral person. So for someone to start thinking of me as someone who has orgy parties at my house while my son is home, that's severely humiliating to me." Plaintiff further testified that she would never "go out and talk to people about" such things, even in a joking manner. Curiously, however, on February 23, 2010, plaintiff was herself discussing on Facebook her desire for a female friend to join her "naked in the hot tub." The previous day on her Facebook page, plaintiff was discussing "naked Twister." May 22, 2010 postings on

2

plaintiff's Facebook page by her Facebook "friends" talked about female orgies involving plaintiff, Cassie Bridges, and others, to be filmed by plaintiff's husband.

Plaintiff filed a charge of discrimination with the EEOC on April 14, 2010. Therein, she alleged that vicious and untrue sexual rumors were being spread about her by a coworker, resulting in a hostile work environment. Plaintiff also alleged that the unwanted phone calls had been placed by Officer Thomas.

For unknown reasons, plaintiff's cell phone records were not received by defendant until May 14, 2010. The records showed that the calls were actually placed from the phone of Ms. Bridges. On June 17, 2010, Bridges appeared at the police department to be interviewed by Sergeant Tedford. However, Bridges was accompanied by plaintiff and refused to be interviewed outside of plaintiff's presence. Sergeant Tedford and Captain Mike Uher explained to plaintiff that it would be inappropriate for her to be present during the interview since she was the victim of the alleged crime. Plaintiff admittedly became agitated. Bridges refused to be interviewed alone, and the investigation was closed.

Subsequent to the Bridges interview incident, plaintiff wrote an undated letter to her superiors. Therein, she complained of retaliation and harassment causing an "emotional state of mind . . . such that I am unable to perform the simplest tasks of a police officer." Plaintiff requested administrative leave or reassignment to another position. Defendant placed her on administrative "light duty" effective June 23, 2010. Her first light duty assignment was to clean out a supply closet. Plaintiff testified that she then for the first

time contemplated resigning, because she found the assignment to be "kind of degrading." However, by his uncontroverted affidavit, Captain Uher states:

> I have had to clean out closets as part of my job duty requirements when I was placed on light duty assignment. I know of several male officers, including Deputy Chief Allen Massengill, who have also had to clean out closets in the Police Department periodically. Over time the closets become cluttered and need cleaning and reorganizing.

While plaintiff claims that Captain Uher told her "the supply closet hadn't been cleaned in years," she admittedly does not know whether or not a male officer has ever had to clean out a closet while on light duty.

The remainder of plaintiff's light duty work involved fingerprinting and reports. On July 26, 2010, defendant reassigned plaintiff to light duty in the Administrative Sergeant's Office, to be supervised by Sergeant Shannah Newman. Plaintiff states that on September 1, 2010, Sergeant Newman accused her (but not a male officer working in the same room) of taking excessive breaks. Sergeant Newman told plaintiff that she should "consider it as a last warning." According to plaintiff's deposition testimony, Sergeant Newman's demeanor was "humiliating" and made her cry.

As a result, plaintiff submitted her letter of resignation that same day, stating that "treatment by co-workers and supervisors has gotten much, much worse" since the filing of her EEOC charge. Plaintiff wrote, "I have been mocked, ridiculed, disciplined and forced to endure a hostile work environment. It is apparent that this treatment of me will not stop until I am no longer with this department."

4

## II.

*Summary Judgment Standard*

Defendant's motion is brought pursuant to Federal Rule of Civil Procedure 56, which governs summary judgment.[1] Rule 56(a) sets forth the standard governing summary judgment and provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion." This can be done by citation to materials in the record, which include depositions, documents, affidavits, stipulations, and electronically-stored information. Fed. R. Civ. P. 56(c)(1)(A). Rule 56(c)(1)(B) allows a party to "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

A summary judgment movant must first demonstrate that the non-moving party has failed to establish an essential element of that party's case for which it bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the

---

[1] Federal Rule of Civil Procedure 56 was amended effective December 1, 2010. The Advisory Committee Notes to the 2010 amendments reflect that the standard for granting summary judgment "remains unchanged," and "[t]he amendments will not affect continuing development of the decisional law construing and applying [that standard]." Fed. R. Civ. P. 56 advisory committee's note. The instant summary judgment motion was filed after the revised version became effective and therefore is governed by that version. *Cf. Wheeler v. Newell*, 407 F. App'x 889, 891 n.3 (6th Cir. 2011) ("The motion for summary judgment in this case was filed prior to December 1, 2010, and is governed by the version of Rule 56 that was in effect at the time the motion was filed.").

5

moving party carries that initial burden of showing that there are no genuine issues of material fact in dispute, the non-moving party must then present specific facts demonstrating a genuine issue for trial. *See Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In order to defeat a motion for summary judgment, the non-moving party must present significantly probative evidence in support of its complaint. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

The non-movant's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *See id.* at 255. However, the court "cannot rely on unsworn inadmissible hearsay when ruling on a summary judgment motion." *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 457 (6th Cir. 2004). Instead, the court must determine whether the admissible evidence requires submission to a jury or whether the movant must prevail as a matter of law because the issue is so one-sided. *See Liberty Lobby,* 477 U.S. at 251-52.

## III.

### Analysis

Title VII makes it illegal for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). Additionally, Title VII further provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against

6

any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3(a). Title VII also has been construed as prohibiting sexual harassment so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (citation omitted).

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court established "the order and allocation of proof in a private, non-class action challenging employment discrimination" under Title VII. *See McDonnell Douglas*, 411 U.S. at 800-03. Under the *McDonnell Douglas* framework, a Title VII plaintiff must first establish a *prima facie* case of discrimination. *See id.* at 802. The elements necessary to make a *prima facie* showing will vary depending on the facts of each case and the type of discrimination alleged. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 575-76 (1978).

The plaintiff bears the burden of persuasion throughout the entire process. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 793 (6th Cir. 2000). If the plaintiff is able to establish her *prima facie* case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* at 792-93. If the employer successfully provides such a reason, *McDonnell Douglas's* regime then places the final burden on the plaintiff to "demonstrate by competent evidence" that the employer's proffered reason is in fact merely a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 805.

7

The present complaint contains five gender discrimination claims: harassment, constructive discharge, disparate treatment, retaliation, and hostile work environment. The complaint also presents seven state law claims. The court will address these allegations in turn.

## A. Harassment

Although stated by plaintiff as a separate claim, "harassment" is in general a component of claims for retaliation, hostile work environment, disparate treatment, and constructive discharge. *See, e.g., Barrett v. Whirlpool*, 556 F.3d 502, 514 (6th Cir. 2009); *Morris*, 201 F.3d at 789-92. Plaintiff's harassment allegation will therefore be analyzed as a component of her other Title VII claims (where relevant, and where raised by plaintiff), rather than as an independent, distinct legal theory.

## B. Constructive Discharge

To demonstrate constructive discharge, a plaintiff must present evidence that her employer deliberately created what a reasonable person would deem intolerable working conditions, and that the employer did so with the intention of forcing the plaintiff to resign. *See Logan v. Denny's*, 259 F.3d 558, 568-69 (6th Cir. 2001) (citation omitted). Constructive discharge analysis focuses not only on the objective feelings of the employee, but also on the employer's intent. *See id.* at 569.

The present plaintiff falls far short of demonstrating constructive discharge. The court first observes that the constructive discharge count of the complaint contains

nothing but boilerplate accusations, many of which are inapplicable to this case. The complaint alleges that plaintiff felt forced to resign because, in part, she was subject to demotion, salary reduction, and reassignment to work under a younger supervisor. However, by plaintiff's own admission, none of those things happened in this case.

The constructive discharge section of plaintiff's summary judgment briefing is no improvement. [Doc. 20, p. 23-24]. In the caption of that section, plaintiff states, "It is clear that the Plaintiff can set forth evidence to support her claims that she was constructively discharged." [Emphasis in original]. While plaintiff may feel that she "can" set forth the requisite evidence, in reality she makes no effort to do so. Instead, plaintiff again recites paragraphs of boilerplate language with no accompanying facts. Arguably, plaintiff has abandoned her constructive discharge claim. *See Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) (a litigant's conjecture and conclusory allegations are insufficient to survive summary judgment).

The *disparate treatment* portion of plaintiff's briefing does contain the statement, "[T]he Plaintiff felt like she was placed in a position that she needed to resign." [Doc. 20, p.18]. In support of that contention, plaintiff argues that "she was forced to clean a closet . . . in contrast to what male officers had to do when they were on light duty," and that she "was also accused [on September 1, 2010], by her supervisor, of taking several 30 to 40 minutes [sic] breaks, although a male co-worker" told the supervisor that she was incorrect.

First, it is undisputed in the record that male officers also cleaned out closets while on light duty. Regardless, cleaning out a closet (which plaintiff considered "kind of degrading") and receiving one allegedly-incorrect reprimand do not amount to what a reasonable person would deem intolerable working conditions. Further, plaintiff has made no effort to show that the closet assignment and the reprimand were intended by the defendant to make her quit her job.

Summary judgment will be granted on plaintiff's constructive discharge claim. This court cannot and will not make a party's arguments for her, and the instant plaintiff has fallen far short of making her necessary showing. *See U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191 (6th Cir. 1997) ("It is well settled that the non-moving party must cite specific portions of the record in opposition to a motion for summary judgment, and that the court is not required to search the record for some piece of evidence which might stave off summary judgment."). "Where the defendant demonstrates that after a reasonable period of discovery the plaintiff is unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment should be granted." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992).

C. <u>Disparate Treatment</u>

To establish a *prima facie* case of gender discrimination under a disparate treatment theory, a plaintiff may show that: (1) she was a member of the protected class; (2) she was subjected to an adverse employment action; (3) she was qualified for her position;

and (4) she was replaced by someone outside the protected class, or that a person outside the protected class was treated more favorably. *See Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004). Obviously, plaintiff is female and a member of a protected class, but she has not shown that she was subjected to an adverse employment action, or that a male was treated more favorably. However, before addressing those points, the court is compelled to mention defendant's argument regarding whether plaintiff was qualified for her job.

The defense argues that plaintiff was unqualified because she wrote in her June 2010 letter that she was "unable to perform the simplest tasks of a police officer." Defendant misstates the record. Plaintiff's comment, read in context, meant that the alleged hostile work environment had rendered her unable to do her job. Elsewhere in the record, 2009 Probationary Monthly Observation Reports indicate that plaintiff was generally performing at an acceptable level. For example, on February 7, 2009, Lieutenant Johnson wrote that plaintiff was "performing satisfactorily in all areas." Further, defendant's corporate representative, Tammy Dunn, testified that plaintiff was a good employee. Therefore, plaintiff was qualified for her position.

Summary judgment must nonetheless be granted as to the allegation of disparate treatment. Plaintiff has not shown that she was subject to an adverse employment action, which is defined as "a materially adverse change in the terms and conditions of [a plaintiff's] employment." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (citation omitted). "Adverse employment actions are typically marked by a significant

11

change in employment status, including hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (citations and quotations omitted). "[I]t is impossible to list every possible employment action that falls into the definition of adverse employment action and a court must consider indices that might be unique to a particular situation." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 799 (6th Cir. 2004) (citation and quotation omitted).

Plaintiff insists that she "clearly suffered" five adverse employment actions. [Doc. 20, p. 17-18]. First, she again argues that she was "forced to clean a closet . . . and male employees did not [sic]." The closet assignment did not result in significantly different job responsibilities. Plaintiff *requested* light duty work. As a result, she had to spend one week straightening up a closet. This was not an adverse employment action. Moreover, as to the fourth element of her *prima facie* case, it is undisputed that male employees also cleaned out closets while on light duty.

Next, plaintiff cites her testimony that in the summer of 2010 she was "written up" due to an incident at the Rocky Top Market, but that a similar male officer was not. Plaintiff admits, however, that no one ever told her that she was being disciplined as a result of this incident. She incurred no consequence such as firing, demotion, suspension, or reduction in pay. This was not an adverse employment action.

Next, plaintiff cites her testimony that on July 4, 2010, her name was left off of the "special assignments" list, and that as a result she would have missed work that day

had another employee not notified her that she was supposed to be there. This incident does not *approach* the level of an adverse employment action.

Next, plaintiff claims that by the summer of 2010 defendant was monitoring her vehicle's GPS and "tracking her every move." However, in her deposition testimony plaintiff admitted that this is only a suspicion. Further, even if plaintiff *was* being monitored, she admittedly has no idea whether male officers were similarly being watched. Subjective assessments, personal beliefs, conjecture, and speculation are insufficient to prove a *prima facie* case. *See Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 463 (6th Cir. 2001).

Lastly, plaintiff argues that she suffered the adverse employment action of constructive discharge. As discussed in the previous section of this opinion, plaintiff has failed to make that showing.

The court has construed plaintiff's evidence in the light most favorable to her. Even in that light, plaintiff's disparate treatment arguments amount to little more than conspiracy theories and workplace trivialities. Plaintiff admittedly was never demoted, suspended, denied a promotion, or subjected to a salary reduction or negative change in work hours. Hurt feelings and bruised egos do not make an action adverse. *See Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 886 (6th Cir. 1996). "[C]onspiratorial theories" fall short of the specific facts required by Federal Rule of Civil Procedure 56. *See Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002), *citing and quoting Visser v. Packer Eng'g Assocs.*, 924 F.2d 655, 659 (7th Cir. 1991) ("summary judgment was appropriate where the inferences plaintiff

13

sought to draw from evidence were akin to 'flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from [personal] experience.'"). Summary judgment will therefore be granted as to plaintiff's disparate treatment claim.

## D. Retaliation

To establish her *prima facie* case of retaliation, plaintiff must prove that: (1) she engaged in an activity protected by Title VII; (2) her exercise of protected rights was known to defendant; (3) defendant thereafter took an adverse employment action against her, or she was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). Plaintiff has shown the first two of these elements. She filed a charge of discrimination with the EEOC, and defendant had knowledge of the charge.

Plaintiff's retaliation claim fails, however, on the third and fourth elements. As to the third, plaintiff cites the same alleged adverse employment actions just discussed by the court in its consideration of the disparate treatment claim. As noted, none of those events were adverse employment actions, nor do they collectively amount to pervasive harassment by a supervisor.

Plaintiff does argue two additional examples of alleged retaliation. She testified that Captain Uher told coworker Amy Caldwell not to talk with her outside of work. Also, plaintiff testified that she was told by someone in the deputy chief's office not "to talk

14

about anything at work with other employees unless it's completely work related . . . because they are having to deal with my issues, I should just be grateful that I have a job."  Again, these are workplace trivialities - not adverse employment actions - and plaintiff's arguments do not cumulatively amount to severe or pervasive retaliatory harassment by a supervisor.

Even if plaintiff had satisfied the third element of her *prima facie* case, she has not met the fourth element, causal connection.  It is a plaintiff's burden to produce sufficient evidence from which a causal connection can be inferred, *see Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 563 (6th Cir. 2004), and plaintiff has not done so.  Summary judgment must therefore be granted as to her retaliation claim.

### E. Hostile Work Environment

A plaintiff may show a violation of Title VII via a hostile work environment claim without having to prove that she suffered an "adverse employment action."  *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000).  The elements of a *prima facie* hostile work environment claim are: (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment; (3) the harassment was based on the employee's gender; (4) the harassment created a hostile work environment; and (5) *respondeat superior* liability.  *Clark v. United Parcel Serv.*, 400 F.3d 341, 347 (6th Cir. 2005).  Regarding the fifth prong, "[a]n employer is liable if it knew or should have known of the charged [coworker] harassment and failed to implement prompt and appropriate corrective action."  *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999)

15

(citation and quotations omitted).

To be actionable under Title VII, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)). The court must look at the working environment in its totality, considering the frequency and severity of the alleged conduct, whether the conduct was physically threatening or humiliating as opposed to a mere offensive utterance, and whether it unreasonably interfered with the employee's work performance. *See Harris*, 510 U.S. at 23.

Offhand comments do not establish a hostile working environment under Title VII, *see Morris*, 201 F.3d at 790; *Faragher*, 524 U.S. at 787, and mere insensitivity should not be confused with discrimination. *Faragher*, 524 U.S. at 787. However, "the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether - taken together - the reported incidents make out such a case." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (emphasis in original).

Plaintiff claims that Officer Thomas's rumors created a hostile work environment based on her gender, for which defendant should be liable for failing to stop. In response, defendant argues that: (1) it sufficiently responded to her every complaint; (2) plaintiff has insufficient admissible evidence to support her claim; and (3) plaintiff could not

16

possibly have found the workplace rumors to be offensive when she herself was making similar statements on Facebook.  The court has considered defendant's arguments while construing (as it must at this stage of the case) the admissible evidence in the light most favorable to plaintiff.  Having done so, the court concludes that plaintiff has set forth (although perhaps just barely) a *prima facie* hostile work environment claim.

The court turns first to plaintiff's evidence.  Plaintiff testified that Thomas *directly* told her that her "husband [was] trying to get him [Thomas] to have an orgy" involving Cassie Bridges, and that "he felt like I was a lesbian and I wanted to be part of it." [Plaintiff deposition, p. 202].  Plaintiff testified that she requested light duty "[b]ecause of these things that I had been hearing from other officers.  It was starting to bother me." Specifically, plaintiff testified that Officer John Criswell and Sergeant Tedford told her that Officer Thomas was spreading rumors that plaintiff had invited Officer Thomas to an orgy, and that she was distributing nude photos of herself "to whoever wanted them."  According to plaintiff, other officers ("almost every member of my squad") continued to "come to me telling me other things that [Thomas] has said throughout the squad."  Plaintiff further testified that she asked Sergeant Tedford and Captain Uher to make Officer Thomas stop talking about her sexually, but that Officer Thomas never stopped.

At her deposition, plaintiff was asked whether any other employee made harassing comments toward her or about her.  In response, plaintiff specified the following:

17

1. Officer Criswell "told other officers . . . that I was a worthless police officer who was only trying to get someone in trouble and didn't deserve to be there."

2. Officer Criswell said directly to her, "I heard you like to swing. Maybe we can get together sometime. I know girls that you will like."

3. An Officer "Hines or Haynes" told her that "Officer Henderson . . . was telling officers that, had I only slept with John Thomas, none of that would have happened . . . ."

4. Officer Trae Sweeten "told other officers . . . I had lost my mind and that I was nutty and that I shouldn't be a police officer."

5. Officer Brad Jenkins told other officers "that I'm crazy and things like that."

6. A coworker said that employee Karen Jenkins "call[ed] me a whore."

7. Officer Barkhill "told me that he wished that I wasn't – I hadn't been so bitchy."

8. Captain Uher called plaintiff into his office "six or seven times to explain a rumor that had been going around." These rumors included "do I have naked pictures of myself or am I inviting people to orgies at my house."

9. Plaintiff named other officers who "told [me] that they heard these comments."

The court agrees that much of this evidence is inadmissible and irrelevant. Generally, plaintiff's testimony that some other person told her they heard a rumor is hearsay. *See United States v. Blackwell*, 459 F.3d 739, 755 (6th Cir. 2006). The testimony is hearsay because it is offered in this case to prove the existence of the rumors. *See id.* As such, most of plaintiff's rumor testimony is inadmissible and has not been considered by the court. Moreover, some of the rumors are not based on her gender (for example, being called "crazy," "nutty," or "worthless") and would be irrelevant even if admissible.

18

The following evidence is, however, admissible, cumulatively showing rumor-and gender-based sexual harassment:

1. Plaintiff testified that Thomas *directly* told her that her "husband [was] trying to get him [Thomas] to have an orgy" involving Cassie Bridges, and that "he felt like I was a lesbian and I wanted to be part of it."

2. Plaintiff testified that Sergeant Tedford told her that Officer Thomas was spreading rumors that she had invited Officer Thomas to an orgy, and that she was distributing nude photos of herself "to whoever wanted them." This statement is not hearsay. Sergeant Tedford was plaintiff's supervisor and it appears that he was investigating the rumors. *See* Fed. R. Evid. 801(d)(2)(D) (A statement offered against a party, "made by the party's agent or employee on a matter within the scope of that relationship and while it existed," is not hearsay.).

3. Plaintiff testified that Officer Criswell said directly to her, "I heard you like to swing. Maybe we can get together sometime. I know girls that you will like." This evidence supports the existence of the workplace rumors.[2]

4. Plaintiff testified that Captain Uher called her into his office "six or seven times to explain a rumor that had been going around." These rumors included "do I have naked pictures of myself or am I inviting people to orgies at my house." As with Sergeant Tedford, this testimony is not hearsay. *See* Fed. R. Evid. 801(d)(2)(D).

The court next considers defendant's argument that plaintiff could not have truly been offended by Officer Thomas's rumors when she was saying the very same things on Facebook. Plaintiff objects to the Facebook evidence as unauthenticated hearsay. She is incorrect. Many of the Facebook statements were made by plaintiff herself and thus are

---

[2] However, Officer Criswell was also plaintiff's Facebook "friend" at the time of her public "hot tub" conversations on that website. It is therefore possible that plaintiff herself was the source of what Officer Criswell "heard," but at summary judgment the court must, again, construe the evidence in the light most favorable to plaintiff. Down the road, plaintiff's jury will be fully able to consider her Facebook banter and make its own determination.

19

are not hearsay.  At her deposition, plaintiff acknowledged that the evidence was indeed from her Facebook page.  The evidence has thus been authenticated.  *See* Fed. R. Evid. 901(a), (b)(1).

In further response, plaintiff testified that the Facebook postings were "obviously" jokes.[3]  Plaintiff testified that these "jokes" were not embarrassing or humiliating to her because they were "between friends."  Plaintiff differentiates the rumors spread by Officer Thomas as being embarrassing because they were spread in the workplace to "people that don't know me well."

Defendant presents a very enticing argument but - again - at summary judgment the non-movant's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  For now, the explanation offered through plaintiff's deposition testimony has some substance and must be credited by the court.  As noted above, the jury will have ample opportunity to consider the Facebook evidence and reach its own conclusions in this matter.

Lastly, although defendant argues there can be no *respondeat superior* liability because it responded to each of plaintiff's complaints, there has been evidence submitted to the contrary.  Plaintiff brought the rumors to her supervisors' attention and asked that they be stopped.  Defendant did eventually transfer Officer Thomas to a different shift, but there

---

[3] Plaintiff similarly testified that her husband and her friend are "always joking about being boyfriend and girlfriend on the side.  Obviously, they are not."  Those "jokes" include "getting her naked in the hot tub with him."

is evidence that the rumors nonetheless continued.  Plaintiff has accordingly raised a genuine issue of material fact as to *respondeat superior* liability.  *See Hafford*, 183 F.3d at 513.

For these reasons, the court concludes that plaintiff has sufficiently set forth a *prima facie* hostile work environment claim.  Plaintiff's evidence raises a genuine issue of material fact as to whether her working environment was one that a reasonable person would find hostile or abusive.  Defendant's summary judgment motion must be denied as to this single count.

### F. State Law Causes of Action

Plaintiff's complaint alleges state law claims of "extreme and outrageous conduct," negligent infliction of emotional distress, and intentional infliction of emotional distress.  Defendant is entitled to summary judgment on those claims.

The Tennessee Governmental Tort Liability Act ("GTLA") generally provides that "all governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities . . . engaged in the exercise and discharge of any of their functions, governmental or proprietary."  Tenn. Code Ann. § 29-20-201(a).[4] The only exception potentially relevant to the present complaint is the waiver, in certain instances, of governmental immunity "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment[.]"  Tenn. Code Ann. § 29-20-205.  However, excepted from that exception are claims for "infliction of mental anguish."

---

[4] The defendant is a "governmental entity" for purposes of the GTLA.  *See* Tenn. Code Ann. § 29-20-102(3)(A).

Tenn. Code Ann. § 29-20-205(2); *see also Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997) (outrageous conduct and infliction of emotional distress are the same tort); *Johnson v. S. Cent. Human Res. Agency*, 926 S.W.2d 951, 952-53 (Tenn. Ct. App. 1996) (claims for "mental anguish" and "outrageous conduct" are the same thing). The defendant is accordingly immune from suit for claims of outrageous conduct and infliction of emotional distress.

The complaint also alleges negligent hiring, negligent supervision, negligent training, and gross negligence. In support of those claims, the complaint "incorporates [its] foregoing paragraphs" pertaining to the alleged violation of plaintiff's civil rights.

In her summary judgment response, plaintiff briefly addresses her negligent supervision and training claims, contending that Captain Uher was negligent in failing to "maintain," "control," and "handle" those employees against whom plaintiff had complained. [Doc. 20, p.13]. Plaintiff's summary judgment response does not mention her negligent hiring and gross negligence allegations. The court therefore presumes that those two claims have been abandoned.

Regardless, defendant is entitled to summary judgment on all four negligence counts. The GTLA provides the defendant with immunity from suit for injuries caused by negligent acts or omissions arising out of "civil rights." *See* Tenn. Code Ann. § 29-20-205(2). Each of plaintiff's negligence claims can only be read as being based on the alleged Title VII violations, and the negligence claims thus "directly flow from" her civil rights

allegations.  *See generally Campbell v. Anderson County*, 695 F. Supp. 2d 764, 778 (E.D.

Tenn. 2010).  Plaintiff's attempt to circumvent defendant's immunity "by couching some of

her civil rights claims . . . in the guise of negligence" cannot succeed.  *Id.*; *accord Hays v.*

*Patton-Tully Transp.*, 844 F. Supp. 1221, 1223 (W.D. Tenn. 1993).

## IV.

### Conclusion

Notwithstanding the 12 counts presented in this case, plaintiff's complaint and

briefing have brought to the court only (if anything) a hostile work environment claim.  That

claim will be allowed to proceed to trial.  Defendant's summary judgment motion will be

granted in all other respects.  An order consistent with this opinion will be entered.

ENTER:


                              s/ Leon Jordan
                         United States District Judge